*Decision will be entered under Rule 50.*

MRS. J. B. ATKINS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MRS. J. B. ATKINS, ADMINISTRATRIX, ESTATE OF J. B. ATKINS, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 38519, 38520. Promulgated June 22, 1933.

*W. Scott Wilkinson, Esq., C. Hoffman Lewis, Esq.,* and *Elmo P. Lee, Esq.,* for the petitioner.

*John H. Pigg, Esq.,* for the respondent.

OPINION.

SMITH: These proceedings, consolidated for hearing, are for redetermination of the following deficiencies in income tax:

| Docket No. | Taxpayer | Year | Deficiency |
|---|---|---|---|
| 38519 | Mrs. J. B. Atkins | 1923 | $17,090.98 |
| 38520 | Mrs. J. B. Atkins, Administratrix, Estate of J. B. Atkins. | Jan. 1, 1923 to Oct. 28, 1923 | 17,090.98 |

J. B. Atkins died on October 28, 1923. J. B. Atkins and Mrs. J. B. Atkins were members of a marital community, resident in Shreveport, Louisiana, from January 1 to October 28, 1923. Separate income tax returns were filed for each—that for Mrs. J. B. Atkins covering the calendar year, and that for the decedent to the date of his death. In each return was reported one half of the income of the marital community and in the audit of the returns the respondent has found, without objection as to the period involved, the same deficiencies for each petitioner.

The issues involved in these proceedings are common to each petition, except that with respect to the eighth issue, which involves the question whether the respondent erred in disallowing the deduction from the community income of $118.31 representing interest accrued at the date of death of J. B. Atkins on October 28, 1923, which interest was paid by the estate of J. B. Atkins on November 8, 1923.

Some of the issues have been settled by stipulation of the parties. The issues not so settled will be considered in order.

(1) The income tax return of Mrs. J. B. Atkins and that filed by her for her deceased husband for 1923 show that in that year the taxpayers received $150,500 from the sale of shares of stock of the Shreveport-Eldorado Pipe Line Co. acquired in 1921 and 1923 at a cost of $11,500—net profit $139,000. In the adjustment of the returns the respondent has increased the profit upon the sale of this stock in the amount of $4,900 by reducing the cost from $11,500 to $6,600. On brief the respondent admits that the reduction in the cost should be only $4,500, or, in other words, that the cost should be $7,000 for the shares sold.

The evidence shows that in 1923 the petitioner sold 2,100 shares of stock of the Shreveport-Eldorado Pipe Line Co. to Lilley, Blizzard & Co. of Philadelphia. The ledger of the decedent shows a cost for the shares of stock sold of $11,500; that on March 20, 1923, the decedent acquired from his sister-in-law, Mrs. V. B. Terrett, 75 shares of this stock at $60 per share, total $4,500. The respondent contends that the decedent made an ineffectual transfer of these shares to his sister-in-law in a prior year and that the amount of $4,500 repre-

sents a portion of the sale price which was eventually paid to Mrs. Terrett by the decedent's executor. The evidence, however, is clearly to the contrary. The shares of stock stood in the name of Mrs. Terrett and she had acquired them from the decedent for a valuable consideration. The contentions of the petitioner upon this point are sustained.

(2) The above mentioned tax returns for 1923 likewise show that in that year the taxpayers sold for a consideration of $61,677.50 shares of stock of the Shreveport Producing & Refining Corporation acquired in 1920 at a cost of $209,604.82. The loss claimed in respect of this sale was $147,927.32, which the respondent has disallowed as a deduction from gross income. It is now contended in the light of the evidence that the cost of the shares was not $209,604.82 but was $170,393.50 and that the loss upon the alleged sale was $108,716.

The evidence upon this point is as follows:

On May 3, 1923, the decedent deposited in the Commercial National Bank of Shreveport a draft upon Lilley, Blizzard & Co. of Philadelphia, brokers, for $32,500 and attached thereto certificates of stock of the Shreveport Producing & Refining Corporation for 26,000 shares ($1.25 per share); also, on May 15, 1923, the decedent deposited a draft in the same bank on Lilley, Blizzard & Co. for $29,177.50 to which were attached certificates of Shreveport Producing & Refining Corporation for 23,342 shares; that on May 12, 1923, Atkins loaned to one B. H. Gray on his promissory note payable to the decedent 90 days from date, with interest at 6 per centum per annum, $32,760; that on the same date the decedent issued his check on the Commercial National Bank of Shreveport payable to B. H. Gray or order, in the amount of $32,760. This check bears a typewritten endorsement as follows: "For Deposit To Credit Account B. H. Gray." At that time B. H. Gray had an account with the City Savings Bank & Trust Co. of Shreveport, which showed a balance to his credit on May 12, 1923, of $113.12. This check was deposited in Gray's account at this bank on May 12, 1923. On the same date B. H. Gray drew a sight draft on the City Savings Bank & Trust Co. in favor of the Commercial National Bank of Shreveport for $32,760. The draft was paid by the City Savings Bank & Trust Co. on the same day, May 12, 1923. On May 21, 1923, B. H. Gray gave his promissory note payable to J. B. Atkins 90 days after date, with interest at 6 per centum per annum, for $29,410.92. On the same day the decedent gave his check to B. H. Gray for $29,410.92 drawn on the Commercial National Bank of Shreveport, which was endorsed in writing: "For Deposit Acct. B. H. Gray." B. H. Gray did not personally endorse this check and does not know who did. The check was deposited in the City Savings Bank & Trust Co. on May 21, 1923. On May 23, 1923,

Gray drew a check for $34,450.92 on his account in the City Savings Bank & Trust Co. payable to Commercial National Bank, which was paid by the City Savings Bank & Trust Co. on May 23, 1923.

The records of the Shreveport Producing & Refining Corporation show that certificates for 49,352 shares of Shreveport Producing & Refining Corporation stock, claimed to have been sold by the decedent to Lilley, Blizzard & Co. for $61,677.50, were surrendered for cancellation on May 15, 1923, that new certificates for 26,000 shares were issued to B. H. Gray on May 15, 1923, and that certificates for 27,342 shares were issued to him on May 23, 1923.

The above referred to 90-day notes given by Gray to the decedent were secured by the collateral of the 26,000 shares and the 27,342 shares claimed to have been acquired by Gray from Lilley, Blizzard & Co. The difference between the 23,342 shares claimed to have been sold to the brokers by the decedent and the 27,342 shares claimed by Gray to have been purchased from the brokers is accounted for by the fact that J. B. Atkins, Jr., at or about this time parted with 4,000 shares of this stock and these shares were acquired by Gray by the same transaction by which he acquired the 23,342 shares in question.

In 1921 B. H. Gray was an employee of the decedent. In 1923 he was employed by the Shreveport Producing & Refining Corporation at a salary of $6,000 per year. The decedent was president of that corporation. Gray's income from other sources was not in excess of $1,000 a year. He could not have purchased the stock claimed to have been purchased by him without borrowing money for such purchase.

The notes given by Gray were not paid at maturity, but were canceled by Gray surrendering to the decedent the 53,342 shares given as collateral security for the notes.

The respondent has disallowed the claimed loss upon the alleged sale of the 49,342 shares of stock by the decedent upon the ground (a) that the record does not show the cost to the decedent of the shares of stock in question, and (b) that there was no bona fide sale of the shares from which any deductible loss was sustained or, if there was, the shares were reacquired by the decedent within 30 days from the date of sale.

The respondent admits that the evidence shows that the decedent acquired 16,000 shares of Shreveport Producing & Refining Corporation stock in 1921 at a cost of $41,500. He contends, however, that there is no evidence in the record showing the cost of the balance of the 33,342 shares of stock sold. The evidence does show, however, that the 33,342 shares of stock in question were acquired through the exchange of Caddo Central Oil & Refining Corporation bonds and that the exchange was made upon the basis of $6 par

value of bonds for one share of the stock. In *John B. Atkins et al.*, 9 B.T.A. 140, we held that Atkins was liable to income tax upon the receipt of these bonds upon the basis that their fair market value at the time of acquisition by Atkins was $644.30 per $1,000 bond. Upon this basis the cost to Atkins of the 33,342 shares in question was $128,893.50 ($3.8658 per share). It is submitted by the petitioner that upon the basis of our prior report the cost of the shares of stock in question was $170,393.50 ($41,500 for 16,000 shares and $128,893.50 for 33,342 shares). This finding is warranted by the principle laid down by the Supreme Court in *Wyoming* v. *Colorado*, 286 U.S. 494, 507, where it was held that findings of fact pertinent to the issues in a suit are not open to dispute in a subsequent suit between the same parties and will be applicable to the issues raised in such subsequent suit. See also *Southern Pacific R.R. Co.* v. *United States*, 268 U.S. 1, 48.

The question now for consideration is whether the taxpayers sustained a deductible loss of $108,716 upon the alleged sale of the 49,342 shares in question. The respondent contends that they did not under section 214 (a) of the Revenue Act of 1921, which reads, so far as pertinent, as follows:

That in computing net income there shall be allowed as deductions:

\*     \*     \*     \*     \*     \*     \*

(5) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with the trade or business; \* \* \* No deduction shall be allowed under this paragraph for any loss claimed to have been sustained in any sale or other disposition of shares of stock or securities made after the passage of this Act where it appears that within thirty days before or after the date of such sale or other disposition the taxpayer has acquired (otherwise than by bequest or inheritance) substantially identical property, and the property so acquired is held by the taxpayer for any period after such sale or other disposition. \* \* \*

The respondent contends that B. H. Gray was in effect the agent of the decedent in the repurchase of these shares.

The bona fides of the transactions by which Atkins is claimed to have sold 49,342 shares of stock of the Shreveport Producing & Refining Corporation at a loss is questioned by the respondent. On the books of account of the decedent the transaction was treated as a sale of the stock. The evidence as to Gray's part in the transaction is decidedly unconvincing that the sale of the shares was made in good faith. On direct examination Gray was asked:

Q. How many shares of stock did you purchase from Lilley, Blizzard & Company and on what basis were your purchases made, Mr. Gray?

A. I have an invoice of Lilley, Blizzard & Company dated May 3, 1923, for 26,000 shares of Shreveport Producing & Refining Company stock at $1.26 a share, amounting to $32,760. That was attached to a draft—I don't find a copy of the draft.

On May 2, 1926, an internal revenue agent addressed a letter to " Lilley, Blizzard & Co., Philadelphia, Pa.", reading as follows:

May I ask that you furnish me with the following information relative to transactions with J. B. Atkins, Shreveport, La., during the early part of 1923.

From information furnished me, it appears that Mr. Atkins made certain sales of Shreveport Producing and Refining Corp. stock to you in the latter part of April and the early part of May 1923. Please advise me if you purchased in the latter part of April or about May 1st 26,000 shares of this stock from Mr. Atkins for $32,500 and on about May 15th an additional 23,342 shares from the same person for $29,177.50.

It also appears that this stock was re-purchased in May, 1923 by Mr. B. H. Gray, Shreveport, La., and I therefore ask that you advise me if your records indicate that Mr. Gray purchased 49,342 shares of Shreveport Producing and Refining Corp. stock from you in May, 1923. If Mr. Gray did make this purchase please give me the date and the consideration.

Assuring you that I shall appreciate a prompt reply, I am * * *.

This letter was answered by Lilley, Blizzard & Co. under date of March 6, 1926, as follows:

In reply to your letter of March 2nd, we beg to advise that in the regular course of our trading business, we did buy from Mr. J. B. Atkins in 1923 the shares of stock of Shreveport Producing and Refining Corporation stated.

It appears that on about May 18, 1923, we sold to Mr. B. H. Gray, 53,342 shares of Shreveport Producing & Refining Stock for a cash consideration of $67,210.92.

Trusting this is the information you desire, we are * * *.

Whether the alleged sale at a price of $1.25 per share was the fair market price of the stock is not shown by the evidence; neither is it shown that the certificates ever left Shreveport. The certificates claimed to have been sold by the decedent on May 15, 1923, to Lilley, Blizzard & Co. were surrendered for cancellation on that day, although it appears from the evidence that they were attached to a draft deposited in the Commercial National Bank of Shreveport for collection on that very day, which draft in the ordinary course of business would not have reached Philadelphia for acceptance and payment on that day. It is not shown that Lilley, Blizzard & Co. had any office in Shreveport. Gray was asked the further questions on direct examination:

Q State the manner in which you acquired your block of stock from Lilley, Blizzard & Company in the year 1923, using such memoranda, invoices, checks or drafts as you may have in your possession to refresh your recollection as to just what occurred at the time. First, did you order this stock from Lilley, Blizzard & Company by letter, telegram, verbally or how?

A I don't remember how.

Q Have you searched your records for letters and telegrams on the subject?

A Yes, but I don't keep much of a record of any sort.

Q Could you find any telegrams or letters bearing on the matter?

A I looked through some old files of mine and all I found were some invoices and checks. I didn't find any record of placing the order.

Q Is it your recollection that you did yourself order the stock or did some-one do it for you?

A I don't recall.

It appears to the Board that if this transaction were a purchase of these shares of stock from Lilley, Blizzard & Co. by B. H. Gray, as contended, B. H. Gray should have a lively recollection of the circumstances under which the purchase was made. At the time he was an employee of the Shreveport Producing & Refining Corporation and received a salary of $6,000 per annum. He stated that his net assets at the time were probably between $25,000 and $30,000. This transaction was a momentous transaction if this was the limit of his resources as he testified.

What arrangement, if any, was made by Atkins with his brokers with reference to this stock is not shown by the record. If as appears to be the fact, Lilley, Blizzard & Co. invoiced to Gray on May 3, 1923, the 26,000 shares of Shreveport Producing & Refining Corporation stock at $1.26 per share, it is apparent that the arrangement by which this was accomplished was made before that date.

Furthermore, it does not appear to the Board that a loan by Atkins to Gray of the full amount of the purchase price of these shares from the brokers, secured by collateral of the shares, was an ordinary business transaction. There is no evidence that upon the maturity of the notes in August 1923, any demand was made upon Gray for the payment of the notes, or that Gray paid any interest upon the notes. Upon the maturity of the notes the certificates securing the notes were surrendered to Atkins. The arrangement by which this was done was made by J. B. Atkins, Jr. Upon the evidence we conclude that Gray was Atkins' agent in the transaction.

We are of the opinion that the respondent's contention that the decedent sustained no deductible loss upon this transaction is well founded. If the alleged sale to Lilley, Blizzard & Co. was bona fide, we are of the opinion that the evidence warrants the conclusion that these shares were reacquired by Gray for the decedent within 30 days from the date of the sale thereof. Cf. *Esperson* v. *Commissioner*, 49 Fed. (2d) 259. The issue upon this point is decided in favor of the respondent.

(3) In 1923 the decedent sold 1,600 shares of stock of the Shreveport-Eldorado Pipe Line Co. for $32,000 and credited the same upon his books of account to his two daughters. The respondent has increased the community income for 1923 by the $32,000 in question.

It is the contention of the petitioner upon this point that these shares of stock were the property of her two daughters; that the

decedent sold them for their account and treated the transaction accordingly.

It appears that at Christmas time, 1920, the decedent announced that he was going to give to each of his four children 500 shares of Shreveport-Eldorado Pipe Line Co. stock of a par value of $100 as a Christmas present. The stock was not delivered at that time, but at a little later date the certificates for the stock were delivered. The stock was transferred upon the books of the Shreveport-Eldorado Pipe Line Co. and each of the two daughters became stockholders of record. In 1923 the par value of the stock was reduced from $100 to $25 per share and each daughter received 2,000 shares in place of the 500 shares which each had theretofore owned. In 1923 the decedent found a market at $20 per share for 1,600 shares of the stock and advised each daughter to make a sale of 800 shares of the stock belonging to each. Certificates for 800 shares, in safe-keeping with the decedent, were endorsed by each daughter and sold by the decedent for the owners and the proceeds invested in bonds, which were later turned over to the daughters or their husbands.

Upon this point the respondent contends that no valid gift of the shares of stock was made by the decedent, for the reason that at the time of the gift there was no power of attorney executed by the decedent stockholder as required by article 1536 of the Louisiana Civil Code, which reads as follows:

Art. 1536 [1523]. *Form of Donation Inter Vivos of Immovables, Incorporeal Things.* An act shall be passed before a notary public and two witnesses of every donation *inter vivos* of immovable property or incorporeal things, such as rents, credits, rights or actions, under the penalty of nullity.

The respondent contends that it was held in *Succession of McGuire*, 151 La. 521; 92 S. 40, that a certificate of stock is an incorporeal thing and can not be transferred without the accompanying power of attorney, properly witnessed, which counsel for the petitioner admits was not done in this case.

In *Succession of McGuire, supra,* the court stated:

On the merits, defendant in rule contends that as the result of the express provisions of Act 180, p. 265, of 1910, entitled "An act to make uniform the law of transfer of shares of stock in corporations," the title to a share of stock may be validly transferred, without consideration, or, in other words, as a donation, by the execution of a power of attorney to sell, assign, or transfer such as the one hereinabove transcribed executed in his favor by decedent.

That contention appears to us to be well founded. Section 1 of the said act provides that title to certificates of stock and to shares represented thereby can be transferred by the delivery of such a document and of the certificate of stock; and sections 6 and 7, read together, provide that such a transfer is "effectual" even though the transferror has received no consideration for same.

The facts indicate that the decedent's daughters were the owners of record on the books of the Shreveport-Eldorado Pipe Line Co. and we think it cannot be contended in the light of the record that the proceeds from the sales of the stock in question inured to the decedent. The evidence is all to the contrary. If he made a gift of money to his daughters and purchased the stock, the gift was valid. Sec. 1539, Civil Code of Louisiana. If, on the other hand, he theretofore owned a certificate of stock which was surrendered for cancellation and reissued to the daughters, the transfer was valid under the decision of the court in *Succession of McGuire, supra.* The contention of the respondent upon this point is not sustained.

(4) The taxpayers not having reported any taxable income for 1923, did not claim any deduction from gross income of donations to charitable institutions. In the determination of the deficiencies the respondent has allowed donations deductible from the community income of $31,245.52, which is the 15 percent limitation imposed by law. The respondent submits that in the event the appeal of the taxpayers is sustained then this deduction for charitable contributions will have to be reduced to 15 percent of the revised net income.

The evidence shows that during the year 1923 the taxpayers made a donation to Centenary College of $50,000 in bonds of the Shreveport Producing & Refining Corporation. The return indicates that other cash donations were made in the total sum of $5,625. The respondent on brief states that Centenary College is an educational institution within the meaning of section 214 (a) (11) of the Revenue Act of 1921, and that the deduction for charitable contributions should be allowed in accordance with the provisions of that section. The matter will be adjusted under the Rule 50 settlement.

(5) In the computation of the deficiencies the respondent disallowed the deduction from gross income of $118.31 representing interest accrued at the date of death of J. B. Atkins on October 28, 1923, which was paid by his estate on November 8, 1923. The returns were made upon the basis of cash receipts and disbursements. The payment of the interest in question was a liability of the estate and is a legal deduction from the gross value of the estate under the provisions of the estate tax law. Not having been paid by the community, it is not a legal deduction from community income in returns made on a cash basis. The action of the respondent on this point is sustained.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*